[No. 17192–5–I. Division One. September 21, 1987.]

PORT SUSAN CHAPEL OF THE WOODS, *Appellant,* v. PORT SUSAN CAMPING CLUB, ET AL, *Respondents.*

177

*William R. Bishin,* for appellant.

*Larry M. Trivett, James Allendoerfer,* and *Allendoerfer & Keithly, Inc.,* for respondents.

McCUTCHEON, J.*—Port Susan Chapel of the Woods, Inc., appeals a judgment substantially in favor of respondents Port Susan Camping Club, the Club's board of directors and other individuals, the Port Susan Camping Club Chapel Association, and Great Outdoor American Adventure, Inc. (the developer).[1] Appellant claims it has exclusive

---

*This appeal was heard by a Supreme Court Justice, a Superior Court Judge, and a retired Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

[1]Great Outdoor American Adventure, Inc., was the successor in interest to the original developer, Roberts Construction Company. Great Outdoor American Adventure, Inc.'s successor in interest, American Adventure, Inc., is currently in bankruptcy proceedings. Therefore the appeal has been stayed as to the respondent developer. In any event, we would be compelled to affirm the judgment in favor of the developer because appellant has failed to cite any authority or present any cogent argument as to why it is entitled to recovery from the developer. *See Yeats v. Estate of Yeats,* 90 Wn.2d 201, 580 P.2d 617 (1978); *Whatcom Cy. v. Kane,* 31 Wn. App. 250, 640 P.2d 1075 (1981).

right to possession and control of the chapel building upon the Club grounds, by virtue of a contract which it claims existed between appellant and the developer of the Club. Therefore, appellant argues, the Club acted wrongfully in assuming control of the chapel building and must answer to appellant in damages and/or return the building to appellant's control.

The Club is situated on land belonging to the Tulalip Tribes in Snohomish County. The developer of the Club entered into an arrangement with the Tribes which is essentially a 75–year lease. At the end of the lease term, the land and all permanent improvements thereon will revert to the Tribes. The developer sold memberships in the Club (about 2,500) but no title to individual lots or land. The lots are for recreational vehicles, and the Club includes various amenities, such as roads, nature trails, public lavatories, senior center, family center and youth center. Entry to the area is controlled by a security gate. Only members and their guests, subject to Club approval, are permitted access.

The original construction plans did not include a worship area. After memberships began to sell, a group of members began meeting for Sunday morning worship services in the balcony of the Club's family center, under the leadership of Robert Noble.

Mr. Noble approached the developer with regard to having a site set aside within the Club for a permanent worship facility. The developer accepted Mr. Noble's urging that the construction of a permanent worship facility would be consistent with the recreational purposes of the Club, and would also assist in the sale of memberships because the greatest use of the Club would be on weekends.

In June 1978, the developer and the "Noble group" selected a site for a permanent chapel building. Club members volunteered their assistance for construction of the

chapel. To aid with contribution of donations, all concerned agreed to create a nonprofit corporation, "Port Susan Chapel of the Woods, Inc."[2]

Because the developer had an earlier unsatisfactory experience with the sort of mischief which can be produced by differing religious beliefs, however well intentioned and sincere they may be, the developer wished to make certain that all members of the Club would always have access to the chapel. Mr. Noble and his group were well aware of the developer's feelings and the reasons therefor. In July 1978, an officer of the developer who was also a former attorney prepared and filed the articles of incorporation of appellant. The articles required the chapel board of directors to be elected annually by the Club membership. The articles also specified that appellant was to be a "Christian nondenominational organization."

During construction, appeals for volunteer labor and contributions went out to the Club membership. Many members made substantial contributions in money or services. The evidence demonstrated the contributors had various understandings as to who the donee was, *e.g.*, the appellant, the chapel building, or the Club members themselves.

The building was constructed during summer 1979 through summer 1980. The chapel was dedicated at a ceremony held in August 1980. The dedication brochure referred to the fact that the structure was the product of "50/50 cooperation" between the developer and the "Port Susan membership."

Until the developer turned control of the Club over to the membership in February 1980, the developer considered the chapel facility to be an asset of the Club. The developer

---

[2]As an aside, it is indeed curious that no one took the time or trouble to make certain of appellant's qualifications to receive donations which would in fact be tax deductible to the donor. Instead, all concerned simply assumed proper tax deductibility.

treated that facility just as it did other "common facilities" within the Club, providing all utilities, insurance, security, and maintenance. The Club members' access to the chapel building was the same as it was with any other facility within the Club, in that the key was available for Club members to check out and use.

Some time after the developer turned operation of the Club over to its members, the Club board of directors became concerned about what appeared to be increasing sectarianism by those in control of appellant. No election of a new chapel board was ever held, and instead, without notice to the Club membership or anyone other than the small "Noble group," new chapel directors were self-selected. They changed the bylaws so as to provide they would serve in perpetuity, with any new chapel directors to be chosen only by the existing board. All new directors were required to have had a "conversion experience" and were required to be committed to certain "Tenets of Faith". To the Club board this seemed intolerant and exclusive.

Appellant's services under control of the "Noble group" persistently became more hostile toward certain Christian faiths, such as the Roman Catholic Church and the Church of Jesus Christ of Latter Day Saints. Several individual Club members who belonged to those faiths had made very substantial and important contributions to the chapel facility.

The Club insisted the chapel be available for use by all groups within the Club. Appellant, on the other hand, began to claim that it had exclusive right to possession and control of the chapel building. Previously, the board of appellant had been ambivalent in this regard, and had debated whether the interests of appellant were better served by permitting the Club to defray the expenses attributable to ownership. Appellant conceded it had no written deed, lease, or other document supporting its claim

of right to possession or control. Instead, it argued that this was the "intent of the developer".[3]

Appellant's board refused to accede to the Club board's demands, and, in January 1983, the Club board of directors seized control of the chapel building. After the takeover, appellant scheduled services at the chapel for two additional Sundays, but then apparently concluded this would be inconsistent with its claim of exclusive right to possession and control, and no more services under the specific auspices of appellant have been held at the chapel. The Club board formed a new nonprofit corporation which is respondent Port Susan Camping Club Chapel Association. It now operates the chapel in accordance with articles of incorporation very similar to appellant's original articles of incorporation.

Appellant commenced this action for "restitution and damages" against respondents. No evidence was produced at trial indicating the developer had anything to do with the events of 1983 and the trial court dismissed the developer at the close of plaintiff's case. Also, the trial court dismissed the individual defendants on the ground they had at all times acted in good faith on behalf of the Club.

There was no evidence indicating any written contract or oral promise by the developer or the Club or anyone else to provide appellant with a chapel building. Rather, the court found that respondents intended the chapel to be a Club amenity like all other common facilities at the Club. The trial court found that appellant proved only that it had a license to operate the worship facility, which license was properly revoked when appellant began excluding certain groups. The court did find that some items of personal property within the building had been donated to appellant and ordered return thereof to appellant. Appellant failed to produce any evidence as to the reasonable market value of

---

[3]Perhaps it is only coincidence that appellant became certain of the intent of the developer after the tragic death of two principals of the developer in an airplane crash in January 1980.

the personal property as of the time of alleged conversion. The court declined to award damages for any wrongful taking of personal property.

Appellant raises 42 assignments of error, but many of them are challenges to findings which are supported by substantial evidence, or they have been waived through failure to provide argument or citation of authority, or they are resolved by our disposition of the first issue.

Appellant first contends there is not substantial evidence that the Club is entitled to exclusive possession and control of the chapel facility. Appellant complains that respondent Club should have first challenged the right of appellant's board members to hold office and should have achieved their removal and replacement before seizing the chapel facility. We agree that by proceeding as it did, the Club accepted the presumption that appropriate and valid corporate resolutions existed to support the previous actions and omissions of appellant. Thus in this action, respondent Club's seizure of the chapel facility made one issue controlling: Whether appellant enjoyed any specific interest in real or personal property, and if so, what.

■ A careful review of the entire record of proceedings, exhibits received in evidence, the learned trial judge's carefully considered oral opinion and findings of fact and conclusions of law, demonstrates the following:

1. The findings of fact enjoy ample support in the evidence;
2. The conclusions of law are fully warranted by the findings of fact;
3. The judgment was rendered in accordance with the findings and conclusions; and
4. No error prejudicial to appellant has occurred.

It would be appropriate to simply affirm the judgment in accordance with *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959) and *In re Meistrell*, 47 Wn. App. 100, 109, 733 P.2d 1004 (1987). The court stated in *Meistrell*, at 109:

Where the trial court's finding is supported by substantial evidence, the appellate court will not substitute its judgment for that of the trial court [citing *Thorndike*] . . . Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair–minded, rational person of the truth of the declared premise. . . .

In the instant case, it appears rather doubtful contrary findings as urged by appellant could survive the "fair–minded, rational person" test. No amount of lawyer skill or finesse can overcome the lack of evidence to support the claims fervently argued by appellant. In other words, the "Noble group" which has control of appellant is entitled to do with it and any property it may own whatever the group wishes, but there is nothing to show any right to possession or control of the chapel facility beyond the license it formerly had and which it no longer has.

Why, in view of what has already been said, should there be any need or even justification for going on with this opinion? First, an explanation of appellant's contentions is essential to satisfy the requirement of appearance of fairness. Second, this case has taken far more than its fair share of the scarce judicial time available at the trial and appellate court levels, by reason of tactics which should neither be encouraged nor permitted to go unmentioned.

Appellant contends it established a lease, not a license. It appears to argue in the alternative that the lease terms were established by an oral promise, or by reading several documents together, or by partial or full performance.

A leading case distinguishing a license from a lease is *Conaway v. Time Oil Co.*, 34 Wn.2d 884, 210 P.2d 1012 (1949).

In determining whether a written instrument constitutes a lease or a license, the court must consider it in its entirety, together with the circumstances under which it was made and determined and the intention of the parties.

A lease carries a present interest and estate in the property involved for the period specified therein, and requires a writing to comply with the statute of frauds. It

> gives exclusive possession of the property, which may be asserted against everyone, including the lessor. A license authorizes the doing of some act or series of acts on the land of another without passing an estate in the land and justifies the doing of an act or acts which would otherwise be a trespass.

(Citations omitted.) *Conaway,* at 893. Here, substantial evidence supports the trial court's determination the developer and the Club intended only a license in favor of appellant.

Appellant takes great comfort in a statement made by the trial court during trial, referring to the Club's action as "high handed". However, neither preliminary statements of a trial court nor even oral opinions are required to be consistent with the court's findings. *See In re Marriage of Harshman,* 18 Wn. App. 116, 120, 567 P.2d 667 (1977). The findings of fact which were entered after considering *all* of the evidence contain the following:

> Plaintiff's license to operate the chapel was forfeited when it tried to exclude and divest the members of the camping club from participation in the affairs of the chapel corporation. The defendant corporation was perfectly at liberty at that point to terminate the plaintiff's license to manage the church facility, and its actions in physically seizing the property to the exclusion of the plaintiff organization were justified and consistent with the law and within their authority as a residual beneficiary of the Roberts Construction Company's possessory rights in the building.
>
> As a consequence, all of plaintiff's claims based on possessory rights to the building will be denied.

At oral argument before this court, appellant placed special reliance upon "exhibit 43." Before and during trial, respondents experienced considerable difficulty in obtaining appellant's compliance with the rules of civil procedure regarding discovery. Appellant sought to introduce at trial "exhibit 43," which purported to show that certain donations had been earmarked to buy specific items for appellant, but the exhibit was rejected as a sanction for failure to comply with the discovery rules. Appellant's counsel on

appeal, in the presence of appellant's trial counsel,[4] stoutly asserted at oral argument a great significance as to "exhibit 43." Counsel for respondents presented the true facts regarding the rejection of this exhibit, but neither of appellant's attorneys acknowledged he has misinformed this court.

At the very least, appellant's counsel violated RAP 11.5(a), which requires argument to be "fair," and RAP 11.5(d), which confines the use of exhibits during argument to illustrative aids and to "exhibits brought up as a part of the record."[5] In addition, it seems to us that this sort of conduct runs perilously close to violating paragraph 5 of the Oath of Attorney as set forth in APR 5(d): "*I will never seek to mislead the judge . . . by any artifice or false statement.*" (Italics ours.)

Counsel's first acknowledgments of and explanations for incorrect statements concerning "exhibit 43" were offered in their letters of apology forwarded following their receipt of copies of this opinion (which did not then include this further paragraph). Trial counsel, William D. Cameron, stated he should bear entire responsibility for any criticism because, in reliance upon his honest, though mistaken, recollection of the trial, he suggested the argument to appeal counsel shortly before oral argument began. Thus, counsel for appeal was, on the spur of the moment, persuaded to adopt and use the argument, the foundation of which had not been checked. The additional, unnecessary burden placed upon opposing counsel and this court was identical regardless of lack of purposeful intent to mislead. Counsel

---

[4]Appellant has had at least three counsel to this point. Until July 18, 1983, it was represented by a firm of attorneys in North Seattle which declined to continue and recommended appellant consult a large Everett firm which apparently was never retained. Appellant was instead represented at trial by a Seattle attorney. On appeal it is represented by another Seattle attorney, although appellant's trial counsel was also present at oral argument.

[5]Clearly, it is permissible to argue that an exhibit was erroneously refused, but that is not an issue here. *Cf. Gammon v. Clark Equip. Co.*, 38 Wn. App. 274, 686 P.2d 1102 (1984), *aff'd*, 104 Wn.2d 613, 707 P.2d 685 (1985).

must appreciate that good faith in advancing an argument consists of something more substantial than merely an absence of bad faith.

Appellant contends the trial court placed inordinate weight upon certain evidence. First, this court will not delve into a trial judge's mental processes. *See State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 482 P.2d 775 (1971). The trial court sitting as a fact finder was free to accept the testimony of some witnesses and reject that of others. *Harding v. Warren,* 30 Wn. App. 848, 639 P.2d 750 (1982). In addition, other substantial evidence supports the trial court's determination appellant held a license and not a lease. *See Wendle v. Farrow,* 102 Wn.2d 380, 686 P.2d 480 (1984) (judgment will be upheld on any ground within the pleadings and the proof).

Appellant claims respondents had the burden of proving they had superior title because appellant was in possession of the chapel when it was seized. It cites *Thomsen v. State,* 70 Wn.2d 92, 97, 422 P.2d 824 (1966) (quoting 52 Am. Jur. *Trespass* § 38, at 865):

> as against one in possession, an intruder must justify his invasion by virtue of his own title . . .

First of all, a licensor must surrender exclusive possession to a licensee upon revocation of the license. *Conaway v. Time Oil Co., supra.* Further, respondents proved their right to possession by at least if not more than a preponderance of the evidence. The Club was not an "intruder" and the *Thomsen* rule is not applicable here.

Appellant contends that, when read together, exhibit 3 (a newsletter on Club stationery), the original articles of incorporation (exhibit 1), and the developer's tax return (exhibit 21) indicating a charitable contribution to "Port Susan Chapel of the Woods," establish a lease in appellant's favor of 75 years' duration. Appellant contends the lease terms established by these documents are that the developer would donate the underlying estate in land and 50 percent of the chapel construction; the consideration

would be that appellant contribute the remaining construction and operate and maintain the chapel for the duration of the developer's lease with the Tribes.

Appellant cites no authority for the proposition a charitable tax deduction by the donor constitutes a promise or offer to contract with the charity. We therefore need not consider the issue. *See Puget Sound Plywood, Inc. v. Mester,* 86 Wn.2d 135, 542 P.2d 756 (1975). At any rate, what someone chooses to report to the Internal Revenue Service might be relevant to intent, but certainly is not dispositive. Furthermore, the developer's tax return indicated a donation to "Port Susan Chapel of the Woods," which could mean either appellant or the chapel as part of the Club. The articles of incorporation authorize appellant to receive donations, but contain no indication any donations have actually been given or are promised. Nor does exhibit 3 contain any promise to appellant. The documents asserted by appellant simply do not create a contract between the developer or Club and appellant. *See Johnson v. Nasi,* 50 Wn.2d 87, 309 P.2d 380 (1957); *Kintz v. Reed,* 28 Wn. App. 731, 626 P.2d 52 (1981).

Appellant contends in its opening brief at page 50 that it partly performed and in its reply brief at page 30 that it fully performed its obligation under the alleged lease. However, appellant's "performance" does not establish any of its alleged contract terms. *See Miller v. McCamish,* 78 Wn.2d 821, 479 P.2d 919 (1971).

Appellant failed to establish the terms of its alleged lease from respondents. Therefore, the statute of frauds bars appellant's claim that it received a parol lease of 75 years' duration. *See* RCW 19.36.010. Appellant complains that some of the respondents should not have been permitted to assert the statute of frauds, because they did not plead it even though the developer had. Appellant waived any CR 8(c) argument by failing to object at trial. *See* RAP 2.5(a).

Appellant contends respondents made a certain "judicial admission." There is no evidence respondents ever conceded the existence of any agreement that appellant would have exclusive possession and control of the chapel facility.

Appellant contends that if it failed to prove exclusive right to possess the chapel then it is entitled to restitution for the benefit it conferred. It is unclear from whom appellant seeks restitution. At any rate, appellant completely failed to establish the value of the benefit it allegedly conferred. Labor, materials, and moneys were donated by *individuals*—the Club members—using appellant as a conduit to obtain a supposed tax advantage. Appellant also implies the Club benefited from appellant's management of the chapel, yet there is a complete lack of any evidence of the value of this "benefit."

Appellant next contends the Club's seizure and operation of the chapel violates the United States Constitution, citing three United States Supreme Court decisions.[6] Appellant simply mentions the decisions and asserts the proposition that they somehow support appellant's position. No clear statement of appellant's legal position or the significance of these authorities is set forth. It is unclear whether appellant is arguing there was a violation of the establishment clause or the free exercise clause. This is a very important area of the law, but it does not appear to have any relevance to this appeal. It is not the responsibility of this court to attempt to discern what it is appellant may have intended to assert that might somehow have merit. *See Hockley v. Hargitt,* 82 Wn.2d 337, 345, 510 P.2d 1123 (1973) (court will not consider claim of error where no argument is made beyond assertion of conclusion itself); RAP 10.3(a)(5) (brief must include argument in support of issues raised).

---

[6]*Lemon v. Kurtzman,* 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971); *Everson v. Board of Educ.,* 330 U.S. 1, 91 L. Ed. 711, 67 S. Ct. 504 (1947); *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946).

Appellant next contends the trial court erred in not awarding damages in addition to ordering return of certain personal property. The property included an organ, piano, pulpit, coffee urn, crib, desk, communion table and C.B. radio. Although appellant is apparently willing to accept the return of these items, it also claims additional damages. Both sides rely upon 18 Am. Jur. 2d *Conversion* § 127 (1985):

> A wrongdoer cannot, after his conversion of property has become complete, lessen the actual damage recoverable by tendering back the property. This rule is particularly applicable where the taking is wilful, or where the property is substantially injured, or where no rule of court permitting it is applied for and granted. On the other hand, there are cases in which it is regarded as proper to order the plaintiff to accept the property in mitigation of damages, even though he is unwilling to do so. Thus, where a conversion was committed in good faith, the court in its discretion may order a return of the goods on timely application by the wrongdoer, accompanied by an offer to pay all costs and a showing that no real injury will result to the owner when possession is restored.

(Footnotes omitted.) While it is true respondents here did not offer to pay costs, it is also true that the trial court found that respondents acted in good faith and also that appellant failed to introduce any evidence as to damages. Contrary to appellant's assertion, it is not entitled to a second trial in order to present evidence of damages. It had a full opportunity to litigate the matter below and simply chose not to do so.

Appellant next contends the court erred in dismissing the individual defendants. We need not address this issue, since appellant failed to prove any damages for which the individuals could be liable. Nor need we address whether appellant would be entitled to interest on a damage award.

Appellant next contends the court erred in awarding certain stained glass panels and pews to respondents. The

court's findings in this regard are based on substantial evidence and will not be overturned.

Lastly, appellant urges that because it achieved some relief in the trial court, it was the "prevailing" party entitled to costs under RCW 4.84.030. This contention is devoid of even arguable merit. *See* RCW 4.84.030; *MacLean v. Bellingham*, 41 Wn. App. 700, 707, 705 P.2d 1232, *review denied*, 104 Wn.2d 1022 (1985), *vacated and remanded on other grounds*, 475 U.S. 1105, 89 L. Ed. 2d 909, 106 S. Ct. 1509 (1986).

In summary, there is no substantial evidence appellant has any continuing property interest in the worship facility, and appellant failed to produce any evidence that it was damaged by wrongful withholding of its personal property. Rather, the trial court's findings are supported by substantial evidence, and the findings in turn support the conclusions and judgment. The judgment is affirmed.

COLE and DURHAM, JJ. Pro Tem., concur.

Reconsideration denied February 9, 1988.