No. 2--01--0870 

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE DEPARTMENT OF TRANSPORTATION
 ) Appeal from the Circuit

ex rel.
 the PEOPLE OF THE STATE
 ) Court of Du Page County.

OF
 ILLINOIS, 
 )

)

Plaintiff-Appellee,
 ) 

)

v. ) No. 1--ED--28

) Parcel ICU--0004A

151 INTERSTATE ROAD CORPORATION;
 ) 
 ICU--0004B

JANE A. GREEN, as Trustee under
 ) 
 ICU--0004 TE1

Provisions of a Trust Agreement ) ICU--0004 TE2

dated July 17, 1968, and known as ) 
 ICU--0004 TE3

the Jane A. Green Revocable Trust, ) No. 1--ED--29

as to an undivided one-half ) Parcel ICU--0003

Interest, and as Trustee of the ) ICU--0003 TE

Nonexempt Marital Trust under the )

Edward H. Green Revocable Trust, ) (Consolidated)

U/A/D July 17, 1968, as to an )

undivided one-half interest; and   )

EDWARD H. GREEN JR., as Successor
 ) 

Trustee
 under
 the Provisions of a )

Trust
 Agreement
 dated July 17, ) 

1968,
 and known as
 the Jane A. )

Green
 Revocable Trust,
 as to an )

undivided one-half interest
, and
   )

as
 Successor Trustee
 of the
 )

Nonexempt Marital Trust
 )

under the
 Edward H. Green 
)

Revocable Trust
, U/A/D July 17,
 )

1968, as to an
 undivided one-half ) 

interest,
 ) 
Honorable

) Kenneth L. Popejoy,

Defendants-Appellants.
 ) Judge, Presiding.

Supplemental Opinion Upon Denial of Rehearing

Defendants, 151 Interstate Road Corporation and Jane A. Green  as trustee and Edward H. Green, Jr., as successor trustee of two revocable trusts, previously appealed an order of the circuit court of Du Page County denying their traverse and motion to dismiss, which they filed in response to an eminent domain proceeding initiated by plaintiff, the Illinois Department of Transportation (IDOT).  We reversed and remanded with directions.  See 
Illinois Department of Transportation v. 151 Interstate Road Corp.
, No. 2--01--0870 (May 30, 2002).  IDOT subsequently filed a petition for rehearing.  On our own motion, we requested defendants to respond to the petition.  Defendants have done so, and IDOT has filed a reply brief.  IDOT takes issue with two portions of our earlier opinion.  First, IDOT contests our conclusion that it failed to act in good faith prior to initiating the present litigation.  Second, IDOT contends that our construction of section 7--102.1 of the Eminent Domain Act (Act) (735 ILCS 5/7--102.1 (West 2000)) is erroneous.  After careful consideration, we deny IDOT's petition for rehearing.  Our original opinion issued in this matter contains an extensive discussion of the facts, which we will not repeat here.

Before addressing these issues, we acknowledge defendants' understandable and legitimate complaint that they are being forced to relitigate issues on rehearing that should have been addressed in IDOT's initial brief.  IDOT's initial brief was nearly devoid of authority.  In its petition for rehearing, IDOT acknowledges this omission as well as the prohibition against using a petition for rehearing as a vehicle for rearguing a case (see 155 Ill. 2d R. 367(b)).  Generally, points not argued are waived and may not be urged on rehearing.  Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001.  This rule is not jurisdictional and may be relaxed as the need for a just result and a uniform body of precedent mandates.  
Catalano v. Pechous
, 69 Ill. App. 3d 797, 814 (1978).  IDOT urges that this exception applies in the present case.  We agree to an extent.  In its petition, IDOT raises several important points that warrant this court's attention.  However, as the Greens have already been put to the effort and expense of litigating this matter in the trial court and once on appeal, we will not apply the waiver rule to their prejudice.

In fact, the expense of litigation to which the Greens were thus far exposed brings us to the central issue underlying IDOT's first contention: Who should bear the cost of a deficient appraisal?  IDOT argues that, in determining whether it acted in good faith, a condition precedent to filing suit (
Department of Transportation ex rel. People v. Brownfield
, 221 Ill. App. 3d 565, 567 (1991)
), it should be judged in light of what information was available to it at each step in the negotiation and condemnation process.  While this argument has some appeal, it completely removes from IDOT any responsibility to police its appraisers or verify that an appraisal upon which it is relying is valid.  Of course, removing this responsibility from IDOT places it upon the owner of a parcel that IDOT seeks to acquire.

Requiring property owners to bear the burden of identifying defective appraisals places them between the Scylla of accepting an inadequate offer and Charybdis of incurring the expense of contesting the offer.  One provision of the Act, however, allows a property owner to escape this dilemma.  If a condemnation action is dismissed, a property owner may recoup attorney fees and costs incurred in defending the action.  See 
Libertyville v. Bank of Waukegan
, 152 Ill. App. 3d 1066, 1072-73 (1987).  Because the good faith of the condemnor in seeking an agreement is a condition precedent to the filing of a condemnation action, the lack of good faith on the part of the condemnor requires the dismissal of the action.  See 
City of Springfield v. West Koke Mill Development Corp.
, 312 Ill. App. 3d 900, 907-08 (2000).  This refuge would be illusory in cases involving flawed appraisals if a condemnor were permitted to rely blindly on any appraisal it received.  If good faith does not subsume some responsibility to insure that a condemnor is proceeding based upon a reasonable appraisal, a property owner could never secure a dismissal in a case like the present one, and, as a result, the cost of policing the condemnor's appraisers would fall solely on the property owner.

IDOT charges that we have created a netherworld between good faith and bad faith.  For IDOT, good faith, in the context of a condemnation, is simply the absence of bad faith.  Given this view, IDOT's position that it acted in good faith simply because it was ignorant of certain defects in the appraisal on which it was relying becomes understandable.  If good faith is merely the absence of bad faith, IDOT's ignorance would defeat any claim that it was acting with some untoward mental state.

We recognize that the term "good faith" is used in many contexts in the law and that it does not have one universally accepted meaning.  
Black's Law Dictionary, for example, provides several not-entirely-overlapping definitions.  Black's Law Dictionary 701 (7th ed. 1999) (defining "good faith" as "A state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards, or (4) absence of intent to defraud or to seek unconscionable advantage").  One widely accepted meaning, which occurs in a variety of contexts, interprets "good faith" to mean something more than the absence of bad faith.

For example, in 
Glass v. Peitchel
, 42 Ill. App. 3d 240 (1976), the court considered whether a parent had demonstrated good faith in not seeking employment such that it was appropriate to abate child-support payments.  The 
Glass
 court made the following observation:

"[I]t appears to us that child support payments may properly be abated or reduced where an inability to pay results from involuntary loss of employment, but we think that such relief should be temporary in nature in the sense that the petitioning party should be required within a reasonable time to establish that continued unemployment was in good faith; 
i.e.
, was the result of mental or physical disability or unsuccessful attempts to obtain other employment."  
Glass
, 42 Ill. App. 3d at 243.

Thus, the 
Glass
 court required a parent, in the absence of mental or physical disability, to make actual efforts to obtain employment in order to remain in good-faith compliance with his or her obligations.  Sitting by idly, ignorant of potential job opportunities, is insufficient to show good faith.  While ignorance of the availability of employment would tend to negate an inference that the parent was deliberately avoiding working, the 
Glass
 court made clear that such a course of action would be incompatible with good faith.

In fact, many courts in many situations have refused to equate "good faith" with the simple lack of bad faith.  See
 
Cayuga Indian Nation v. Pataki
, 165 F. Supp. 2d 266, 299 (N.D.N.Y. 2001) ("
In light of the foregoing, in demonstrating its good faith the State must show more than simply the absence of bad faith"); 
Garrett v. St. Elizabeth Health Center
, 142 Ohio App. 3d 610, 613, 756 N.E.2d 698, 700 (2001) ("A lack of a good faith effort to settle is not synonymous with bad faith"); 
Hoots v. Pennsylvania
, 118 F. Supp. 2d 577, 612 (W.D. Pa. 2000) ("Good faith, though, requires more than simply an absence of bad faith"); 
Freeman v. Pitts
, 503 U.S. 467, 499, 118 L. Ed. 2d 108, 139-49, 112 S. Ct. 1430, 1450 (1992) ("With respect to those areas where compliance had not been achieved, the District Court did not find that DCSS had acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect. This, though, may not be the equivalent of a finding that the school district has an affirmative commitment to comply in good faith with the entirety of a desegregation plan, and further proceedings are appropriate for this purpose as well"); 
Port Susan Chapel of the Woods v. Port Susan Camping Club
, 50 Wash. App. 176, 185-86, 746 P.2d 816, 821 (1987)
 
("Counsel must appreciate that good faith in advancing an argument consists of something more substantial than merely an absence of bad faith"); 
Penney v. Superior Court
, 28 Cal. App. 3d 941, 953-54, 105 Cal. Rptr. 162, 171 (1972) ("Clearly, a good faith decision not to prosecute on the basis of insufficient evidence should be classified as something more than an absence of bad faith in determining whether a defendant can receive a fair trial").  In short, we have created no netherworld.  We have ascribed to "good faith" a meaning that many courts have given it.  While "good faith" may mean different things in different contexts, we are convinced that, in the context of a condemnation, it means something more than the lack of bad faith.

What that "something more" is may be difficult to define.  
At the very least, however, it entails that a condemning authority take some responsibility to ensure that property owners are treated fairly.  Given the facts of this case (see 
Illinois Department of Transportation v. 151 Interstate Road Corp.
, No. 2--01--0870 (May 30, 2002)), it is clear that IDOT did not live up to this responsibility in its treatment of the Greens.  IDOT, by relying on a deficient appraisal, placed them in the position of having to litigate.  Their only possible recourse was to demonstrate that IDOT lacked good faith in its treatment of them.  We conclude that, by demonstrating that IDOT relied on a completely deficient appraisal, they successfully showed a lack of good faith, which, in turn, mandated the dismissal of the instant action.

Except for two points, we will not revisit our conclusion that the appraisal IDOT relied on was completely deficient.  IDOT worries that we have imposed on it a duty to monitor "hundreds and thousands of sales that are recorded in the public records each year to ferret out sales which may have occurred after it received its appraisals and which may be relevant" to an appraisal.  We have imposed no such duty.  We criticized Armstrong's explanation of why he failed to include a certain sale as a comparable in his appraisals.  The sale occurred after Armstrong's initial appraisals but prior to his final one.  Armstrong explained that the property was not a valid comparable because of the principle of "substitution," by which he meant that a potential buyer of the Greens' property would not be interested in this parcel due to its small size.  Armstrong later admitted that he used a property one-sixth the size of the Greens' as a comparable.  We included this criticism not to impose any duty on condemnors to monitor the real estate market in the months following an appraisal; rather, we included it because Armstrong's explanation defied credulity.

IDOT also questions our reliance on the potential for financial bias present in its relationship with Armstrong.  Over the two years preceding the trial, IDOT paid Armstrong's employer over $161,000 based on his work.  This accounts for about half his work and makes IDOT Armstrong's largest account.  Armstrong is paid a commission based on revenue generated from clients.  IDOT argues that these facts reflect the fact that it must, of necessity, use a limited number of appraisers familiar with eminent domain appraisal work.  IDOT's plight is not unique.  All parties who must hire expert witnesses must defend them from similar charges.  In 
Sears v. Rutishauser
, 102 Ill. 2d 402, 407 (1984), our supreme court observed that "[g]enerally, opposing counsel may probe bias, partisanship or financial interest of an expert witness on cross-examination."  Recognizing the importance of potential financial bias, the court went on to hold that counsel may cross-examine an expert witness as to "the number and frequency of referrals from an attorney."  
Sears
, 102 Ill. 2d at 411.  We see no principled way of distinguishing 
Sears
 from the situation IDOT faces.

IDOT also complains that it has neither the expertise nor the resources to question appraisals made by outside appraisers.  Regarding the resources, we note that IDOT likely has better resources than the average property owner.  Further, the claimed lack of expertise does not appear to be an insurmountable problem.  For example, a second independent appraisal by an outside appraiser confirming the first would go a long way toward demonstrating good faith.  In fact, IDOT argues for the first time before this court in its petition for rehearing that such a second appraisal was performed.  Defendants dispute the validity of this appraisal.  We will not address this argument.  Because IDOT did not raise it until its petition for rehearing, we deem it waived. Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001; 
Catalano v. Pechous
, 69 Ill. App. 3d at 814.

We are cognizant that requiring condemnors to take some responsibility for policing their own appraisers will increase the costs to the condemnor for effectuating a condemnation.  However, the alternative, requiring property owners to shoulder this burden, is unacceptable.  Both the Illinois and United States Constitutions require just compensation when the government takes private property for a public use.  U.S. Const., amend. V; Ill. Const. 1970, art. I, §15.  Forcing property owners to bear the expense of uncovering defective appraisals guarantees that owners, confronted by an inadequate offer based on such an appraisal, will be left in a worse position than they would have been had the state not decided to take their property.  Their only two choices would be to accept the low offer or absorb the costs of litigating the matter.  Thus, we conclude that the requirement of good faith requires a condemnor to take some responsibility for the quality of its appraisals.  When that good faith is lacking, a property owner may appropriately secure the dismissal of the action and recover the costs of the litigation.  See 
Bank of Waukegan
, 152 Ill. App. 3d at 1072-73. 

IDOT's second main contention is that our interpretation of section 7--102.1 of the Act (735 ILCS 5/7--102.1 (West 2000)) is unworkable.  This section requires a condemnor to provide a property owner with 60 days' notice prior to initiating a condemnation action.  735 ILCS 5/7--102.1 (West 2000).  Defendants argued that they were deprived of this protection because IDOT filed suit less than 60 days after it revised its offer, reducing both the area to be taken and the compensation to be given.  We agreed.  In our original opinion, we first noted that eminent domain statutes are to be construed strictly in favor of property owners.  
151 Interstate Road Corp.
, slip op. at 21.  We next observed that the plain language of section 7--102.1 draws no distinction between initial and subsequent offers.  
151 Interstate Road Corp.
, slip op. at 21.  Accordingly, we determined that defendants were entitled to 60 days to consider IDOT's new offer.

IDOT charges that this reading of the statute provides a condemnor with a disincentive to negotiate.  IDOT ignores the following language from our original opinion: "In the present case, IDOT reduced both the proposed area to be acquired and the compensation offered.  Had it only reduced the proposed area to be acquired and not modified the compensation offered, we might come to a different result."  
151 Interstate Road Corp.
, slip op. at 22.  Decreases in compensation and increases in area to be taken work to the disadvantage of a property owner; the converse is true of a second offer that increases compensation or decreases the area sought.  Keeping in mind that eminent domain statutes must be strictly construed in favor of owners (
Forest Preserve District of Kane County v. Estes
, 222 Ill. App. 3d 167, 175 (1991)), it is clear that a second offer that prejudices the owner warrants a new 60-day period.  Thus, had compensation remained the same, or increased, a new 60-day period would not have been triggered.  Since the logical product of negotiation is an increased offer of compensation, our interpretation of the statute provides no disincentive to negotiate.

IDOT also asserts that this interpretation will discourage it from "correcting unnecessary takings."  It contends that, as a result, owners will be required to sell property they do not want to, it will be forced to buy land it does not need, and Illinois taxpayers will be required to pay for additional, unnecessary property.  These concerns are unfounded.  The power of eminent domain is limited to takings that are necessary.  
City of Waukegan v. Stanczak
, 6 Ill. 2d 594, 599 (1955).  Hence, IDOT has no authority to take land it does not need and force the taxpayers of this state to shoulder the bill.  At the most, our decision will require IDOT to wait an additional 60 days when it is necessary to make a new offer.  We see nothing unreasonable in giving property owners the period set forth in the statute to consider the actual taking proposed by a condemnor.  At the least, our decision should encourage condemnors to ascertain what it is that they truly need before beginning the condemnation process, rather than proceeding in a haphazard fashion

To conclude, we find no reason to depart from the views expressed in our original opinion.  
151 Interstate Road Corp.
, No. 2--01--0870.
  We recognize the importance of the mission of IDOT and all condemnors charged with performing works in the public interest.  IDOT states in its petition that the project that spawned the present litigation is a $42 million project "fueled by the public's demand for efficient, safe roads that ease the problems of gridlocked suburban intersections."  However, similar things can likely be said about virtually every project in which IDOT engages.  Allowing such concerns to predominate would effectively place the condemnation process beyond judicial scrutiny.  Such a result is something the legislature did not intend, for they provided for court involvement in the Act (see 
e.g.
, 735 ILCS 5/7--102 (West 2000)).

 IDOT raises a few additional arguments, which we find either ill taken or waived.  Accordingly, we deny plaintiff's petition for rehearing.

HUTCHINSON, P.J., and 
GEIGER
, J., concur.