# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of, | No. 57510-8-II |
| A.K., | |
| Appellant. | UNPUBLISHED OPINION |

VELJACIC, J. — A.K. appeals the trial court's order committing her to up to 14 days of involuntary treatment at Telecare Pierce County Evaluation and Treatment (Telecare). A.K. argues that substantial evidence does not support the trial court's finding that she is gravely disabled under RCW 71.05.020(24)(b),[1] that a less restrictive alternative to involuntary detention was not in her best interests, and that she was not a good faith voluntary patient.

We hold that substantial evidence supports the trial court's finding that A.K. was gravely disabled under RCW 71.05.020(24)(b). We decline to address A.K.'s assignment of error regarding the court's finding that a less restrictive alternative was not in her best interests because she fails to provide any meaningful analysis. We also decline to address whether substantial evidence supports the court's finding that A.K. was not a good faith voluntary patient because she failed to comply with the requirements of RCW 71.05.240(3). Accordingly, we affirm the trial court's order involuntarily committing A.K. for up to 14 days at Telecare.

---

[1] On May 11, 2023, the legislature amended RCW 71.05.020. LAWS OF 2023, ch. 425, § 20. However, the amendments do not affect our analysis, so we will use the current version of the statute.

FACTS

I.    BACKGROUND LEADING UP TO THE PROBABLE CAUSE HEARING

A.K. has bipolar disorder with psychotic features. A.K. had previously been involuntarily detained on December 7, 2020, and on December 19, 2021. Her most recent detention occurred at Telecare.

On January 7, 2022, A.K.'s father brought her to the Good Samaritan Hospital emergency department because her mental health decompensated. A.K.'s father reported that she exhibited rapid and pressured speech. The hospital referred A.K. for evaluation and the designated crisis responder (DCR) concluded that she was gravely disabled as a result of a behavioral health disorder. The DCR transferred A.K. to Telecare.

On January 11, a Telecare physician and mental health professional performed a behavioral health status examination on A.K. Based on their examination of A.K., they also concluded that A.K. was gravely disabled. The same day, Telecare filed a petition for 14 days of involuntary treatment pursuant to chapter 71.05 RCW. A probable cause hearing on the petition was set to occur on January 13.

On January 13, the court granted A.K.'s request for a continuance of the hearing. The court reset the hearing date to January 27.

On January 25, Telecare conducted a second behavioral health examination on A.K. The examining physician and mental health professional similarly concluded that A.K. was gravely disabled due to a behavioral health disorder and filed an amended petition for 14 days of involuntary treatment.

2

II.     PROBABLE CAUSE HEARING

On January 27, the court held a hearing to determine if there was probable cause to detain A.K. for 14 days. The State called Yecenia Crisostomo, a clinician at Telecare, in support of the petition. A.K. also provided testimony in support of her release.

A.     Crisostomo's Testimony

Crisostomo testified that she performed the behavioral health examination on A.K. For A.K.'s evaluation, she reviewed the initial detention paperwork, spoke to other members of the treatment team (including A.K.'s provider and nurses on staff), A.K.'s chart notes, and spoke to the rehabilitation specialist.

Based on her examination of A.K., Crisostomo observed that her appearance was appropriate for the environment and that she appeared to be attending to her hygiene. Crisostomo testified that, while A.K. was alert and oriented on all spheres, her memory appeared to be impaired. She explained that "[t]here have been multiples that [she has] spoken with [A.K. herself] in which she has provided [her] with conflicting information." Rep. of Proc. (RP) at 8. For example, on the morning of the probable cause hearing, Crisostomo had to explain the court proceedings to her even though she had already done so the day the prior.

Crisostomo testified that A.K. appeared to be "incredibly labile at times." RP at 8. Based on her observations, A.K. would go between being "incredibly tearful to being irritable and agitated." RP at 8.

As to A.K.'s ability to communicate, Crisostomo testified that she presents rapid and pressured speech a majority of the time. She testified that it is difficult to track conversations with A.K. because of how fast she speaks and because she tends to go off on tangents. Additionally,

A.K. would not take redirection in conversation. Despite these concerns, A.K. is able to communicate her needs.

Crisostomo testified that she observed A.K. responding to internal stimuli. For example, on one occasion, Crisostomo saw A.K. staring out of the window and making hand signals. A.K. then looked at her stating, "Oh, no, no need to worry, I'm just over here having my own little space." RP at 9.

Crisostomo testified that A.K. suffers from paranoid and delusional thought content. As an example, she described a strange interaction with A.K. when she was asking her about which individuals to contact for outpatient care and discharge planning. During this interaction, A.K. began telling Crisostomo that she was afraid of her husband and signaled toward a tattoo on her arm referencing the name "Fuentes." RP at 11. Right after that, A.K. then stated that her husband had attempted to kill her in Colorado Springs and explained that is why she jumped out of a two-story building and took their truck.

However, Crisostomo stated that the day before this interaction, A.K. had told her that she took the truck, went for a drive, and had been crying so hard that she fell asleep until she woke up to another vehicle rear ending her. Crisostomo stated that day after A.K. told Crisostomo about the Colorado Springs incident, A.K.'s story had changed again. According to Crisostomo, A.K. stated that that she had been speeding down a 35-mph zone and that the police were pursuing her. A.K. apparently also mentioned something about an individual named Kevin, who was allegedly a member of the Central Intelligence Agency (CIA) and worked for the drug cartels.

Crisostomo testified that A.K. appears to have impaired judgment and insight. A.K. understands that she has behavioral health disorders, but she lacks insight into how that impacts her ability to complete routine functioning on a daily basis. For example, while A.K. is compliant

with taking her medications at Telecare, Crisostomo testified that "[s]he has made a statement to [her] that she does not want to continue taking her medication because she does not believe in them and prefers to go with . . . hydrotherapy." RP at 12.

Crisostomo testified that A.K. suffered from a lack of cognitive control. As support, she pointed to A.K.'s extreme fluctuations in mood and difficulties in maintaining a linear conversation, as discussed above. She also pointed to one conversation where A.K. told Crisostomo that "she knows that she is too impulsive to have a gun and that most of her boyfriends have a gun." RP at 12. While A.K. had not physically assaulted anyone, Crisostomo testified that A.K. claimed to be "El Chapo's daughter"[2] and that she had made a comment about "making a hit on another patient in [Telecare's] facility." RP at 13.

Crisostomo testified about the harmful consequences that A.K. might suffer if she does not receive treatment for her bipolar disorder in an inpatient setting. She explained that A.K.'s well-being would further deteriorate while she out in the community because, "if she is unable to regulate her affect, especially when she is speaking with others, that it will create more concern for her safety and then also with her inability to have insight into her grandiose thoughts becoming an issue." RP at 15.

Crisostomo testified that she understood A.K. lived between local places, but most recently with her father. As to available placements for A.K., Crisostomo stated that A.K.'s half-sister expressed a willingness to take her back "when [A.K.] is more stable, given her own concern with the pattern [of behavior] that she has seen with [A.K.]" RP at 16.

---

[2] Joaquín Archivaldo Guzmán Loera, commonly known as "El Chapo," is a former drug lord and a former leader within the Sinaloa Cartel in Mexico, an international crime syndicate.

Crisostomo testified that A.K. had two prior involuntary detentions since 2020 with the most recent being in December 2021—just a month prior to the probable cause hearing. As to outpatient services, Crisostomo testified that A.K. attends at times, but that it was unclear when she last received care. When she would go, A.K. would tell the provider during appointments that she had been kidnapped against her will. In fact, A.K.'s half-sister reported that there would be times when she would refuse to go to her appointments. Thus, Crisostomo testified that she was "concern[ed] that [A.K.] may not attend her appointments, which then directly impacts her ability to continue with her outpatient care." RP at 26.

Based on the above facts and A.K.'s bipolar disorder, Crisostomo believed that A.K. was gravely disabled under RCW 71.05.020(24)(b). Crisostomo also believed that a less restrictive alternative treatment was not in her best interests at this time because of her need for further stabilization and because she would not be able to understand or comply with the terms and conditions of the alternative treatment.

On cross-examination, Crisostomo conceded that nothing in the petition for initial detention indicated that A.K. was resistant to going to the Good Samaritan Hospital emergency department. She also conceded that the petition indicated that A.K.'s father reported she had been doing quite well, but had a recent medication adjustment with her outpatient provider in December 2021 and noticed some changes.

B.    A.K.'s Testimony

A.K. testified that she lived in McKenna with her boyfriend prior to arriving at Good Samaritan Hospital. She testified that she did not communicate with her family because her boyfriend and family do not get along well. However, she then testified that she broke up with the same boyfriend prior to her detention and called her father to take her to the hospital.

A.K acknowledged that she has various behavioral health disorders, including bipolar disorder. She also acknowledged that see needed medication to treat her various ailments.

A.K. agreed that she needed inpatient treatment when she arrived at the hospital and at Telecare because she was manic and her new medication was negatively affecting her. She indicated that she engaged in outpatient services with Behavioral Health Resources in Lacey prior to her detention and that she had not missed any appointments.

A.K. testified that, now that she had about 20 days of inpatient care, there has been a significant enough change and wished to be discharged from Telecare. As to placements, A.K. testified that she would stay with her father in Eatonville. She also stated that she could visit her boyfriend in McKenna (the one she broke up with) and that her sister offered her a job to clean her house. A.K. testified that she would be complaint with her treatment and medication upon discharge.

III.     TRIAL COURT'S ORDERS

The trial court entered findings of fact and conclusions of law, which incorporated its oral rulings. In its oral ruling, the court stated that "this is a closer case, given the facts that have been presented. And to a certain extent, the Court's decision comes down to credibility." RP at 37. The court found that A.K.'s story seemed to shift during her testimony, and therefore, found Crisostomo more credible. The court found that A.K. was not credible with respect to her statement that she will continue to take her medication once released. The court also found Crisostomo credible with respect her testimony that A.K. would not be able to follow through with a less restrictive alternative treatment.

Based on the evidence presented, the court found that A.K. was gravely disabled under RCW 71.05.020(24)(b). More specifically, the court found that, "as a result of her [behavioral] health disorder, [A.K.] is manifesting severe deterioration in routine functioning as shown by repeated and escalating and significant loss of cognitive control." RP at 39. The court did not find that A.K. manifested a loss of volitional control. The court considered A.K.'s prior involuntary detentions when entering its finding of grave disability. The court also found that A.K. was not a good faith voluntary patient. The court further found that a less restrictive alternative to involuntary detention would not be in A.K.'s best interests because, based on the testimony, she would be able to understand and follow the terms and conditions of a less restrictive alternative. Accordingly, the court entered a 14-day involuntary detention order at Telecare. A.K. appeals.

ANALYSIS[3]

## I. GRAVE DISABILITY

A.K. argues that the trial court's grave disability finding is not supported by substantial evidence. We disagree.

### A. Standard of Review

"An appellate court reviewing the trial court's decision on involuntary commitment considers whether the trial court's findings of fact are supported by substantial evidence and if the court's findings of fact support the court's conclusions of law and judgment." *In re Det. of A.F.*,

---

[3] While her period of involuntary treatment has ended, A.K. argues that this case is not moot because an involuntary commitment order may have adverse collateral consequences on future involuntary commitment determinations. We agree. It is well established that an appeal of an involuntary commitment order based on the gravely disabled standard is generally not moot because "a trial court presiding over future involuntary commitment hearings may consider . . . prior involuntarily commitment orders when making its commitment determination." *In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012). Accordingly, we will address A.K.'s challenge to the trial court's conclusion that she was gravely disabled.

8

20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022). "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person of the truth of the declared premise.." *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). When considering if there was sufficient evidence, we view the evidence in the light most favorable to the State. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). "We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence." *A.F.*, 20 Wn. App. 2d at 125.

B.    Legal Principles

The involuntary treatment act (ITA), chapter 71.05 RCW, aims to protect the health and safety of those suffering from behavioral health disorders and to protect public safety. RCW 71.05.010(1)(a). Under the ITA, if a person is gravely disabled, then they can be committed for 14 days of involuntary intensive treatment or 90 days of less restrictive treatment, following a petition and hearing. RCW 71.05.230, .240(1). The petitioner's burden of proof at a 14-day commitment hearing is preponderance of the evidence. RCW 71.05.240(1), (4); *A.F.*, 20 Wn. App. 2d at 125.

Involuntary commitment is justified if the "gravely disabled" standard is met under either prong of RCW 71.05.020(24)(a) or (b). *A.F.*, 20 Wn. App. 2d at 125. Relevant here for the purposes of this appeal is prong (b).

Under RCW 71.05.020(24)(b), the court asks if the person, as a result of a behavioral health disorder, "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24)(b) "permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop

9

out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.'" *In re Det. of LaBelle*, 107 Wn.2d 196, 206, 728 P.2d 138 (1986) (quoting Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395, 410 (1985)).

To find that an individual is "gravely disabled" within the meaning of RCW 71.05.020(24)(b), the evidence must show: (1) a severe deterioration in routine functioning *and* (2) failure to receive treatment that is essential for health or safety. *LaBelle*, 107 Wn.2d at 205. Regarding the first requirement, the State must show that the person is showing severe deterioration of routine functioning, evidenced by recent proof of loss of "significant" cognitive or volitional control. *Id.* at 208. Regarding the second requirement, "the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *Id.* The person must be unable to make a rational choice about his need for treatment because of a severe deterioration of behavioral health functioning. *Id.* This creates a causal nexus between the person's severe deterioration in routine functioning and evidence that he would not receive essential care if he were released. *In re Det. of D.W.*, 6 Wn. App. 2d 751, 759, 431 P.3d 1035 (2018).

C.      The Trial Court's Finding of Grave Disability is Supported by Substantial Evidence

Here, substantial evidence supports that, as a result of her behavioral health disorder, A.K. manifests a severe deterioration in routine functioning as evidenced by recent proof of loss of significant cognitive control.[4] As Crisostomo testified, A.K. had been involuntarily detained twice since 2020. In fact, her most recent detention occurred just one month prior to the probable cause hearing. Additionally, Crisostomo testified that A.K. appeared "incredibly labile at times" and

---

[4] Again, the trial court did not find that A.K. manifested a loss of volitional control.

would go between being "incredibly tearful to being irritable and agitated," which is reflective of her behavioral health disorder. RP at 8. While A.K. could communicate her needs, Crisostomo testified about the difficulties in tracking conversations with her because of her rapid speech and disorganized thoughts, which is also reflective of her behavioral health disorder. Furthermore, Crisostomo described instances where A.K. appeared to react to internal stimuli and created stories that indicated paranoid and delusional thought content, such as the alleged Colorado Springs incident. Indeed, Crisostomo explained other instances at Telecare where A.K. claimed to be "El Chapo's daughter" and that she had made a comment about "making a hit on another patient in [Telecare's] facility." RP at 13. Crisostomo also recalled a conversation where A.K. told Crisostomo that "she is too impulsive to have a gun and that most of her boyfriends have a gun," which shows a loss of cognitive control. RP at 12.

Substantial evidence also supports that A.K. would not receive essential care for her health and safety if released from Telecare. A.K. acknowledges that she suffers from behavioral health disorders and that she needs medication to treat those ailments—especially her bipolar disorder. However, Crisostomo testified that "[A.K.] has made a statement to [her] that she does not want to continue taking her medication because she does not believe in them and prefers to go with . . . hydrotherapy." RP at 12. Additionally, based on the information given by A.K.'s half-sister, Crisostomo expressed her "concern that [A.K.] may not attend her appointments, which then directly impacts her ability to continue with her outpatient care." RP at 26.

Crisostomo's testimony provides substantial, recent evidence of A.K.'s severe deterioration in routine functioning, which shows that A.K. has a significant loss of cognitive control. Crisostomo's testimony also demonstrates A.K.'s lack of understanding about her need for medication and outpatient care because of her behavioral health disorder. Accordingly, we

11

hold that the State presented substantial evidence to show that A.K. is gravely disabled under RCW 71.05.020(24)(b).

A.K. argues that insufficient evidence supports that she is gravely disabled because, unlike the patient in *A.F.* 20 Wn. App. 2d 115, she has engaged in outpatient care, did not miss appointments, regularly takes her medication, and voluntarily went to the hospital with her father recognizing her need for help. We disagree.

Here, A.K.'s argument is premised on the mistaken assumption that the trial court did not make credibility determinations in entering its findings of fact and conclusions of law. As explained above, the court did make such findings and found that A.K. was not credible with respect to her statement that she will continue to take her medication once released. Thus, substantial evidence supports that A.K. would not receive essential care for her health and safety if released from Telecare. Additionally, while A.K. recognized her need for help when arriving at the hospital, still substantial evidence supports that she manifested a significant loss of cognitive control based on her recent involuntary detentions and demonstrated behavior while detained at Telecare, as explained above. Accordingly, A.K.'s argument fails.

II.    LESS RESTRICTIVE ALTERNATIVE

A.K. argues that substantial evidence does not support the trial court's finding that a less restrictive alternative to involuntary treatment was not in her best interests. We decline to address the issue.

The Rules of Appellate Procedure provide that an appellant must provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). "It is not the responsibility of this court to attempt to discern what it is appellant may have intended to assert that might somehow have merit." *Port*

*Susan Chapel of the Woods v. Port Susan Camping Club*, 50 Wn. App. 176, 188, 746 P.2d 816 (1987). Thus, "[a]ppellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010).

Here, A.K. assigns error to the court's finding that a less restrictive alternative to involuntary treatment was not in her best interests. However, she does not provide any meaningful analysis as to how the court's finding is not supported by substantial evidence in the record. Accordingly, we decline to address this issue.

III.    GOOD FAITH VOLUNTARY PATIENT

A.K. argues that substantial evidence does not support the trial court's finding that she was not a good faith voluntary patient. The State argues that it is not required to prove that A.K. was not a good faith volunteer because she never alleged that she was a good faith volunteer *prior* the probable cause hearing. We agree with the State.

A.    Legal Principles

The ITA provides that a person detained for 120 hours for evaluation and treatment may be committed for 14 additional days of involuntary treatment. *See In re Det. of D.H.*, 20 Wn. App. 2d 840, 847, 502 P.3d 1284 (2022) (discussing former RCW 71.05.230 (2021)), *review granted*, 199 Wn.2d 1015 (2022); RCW 71.05.230. A petition for a 14-day involuntary commitment can be filed only if certain requirements are met. *D.H.*, 20 Wn. App. 2d at 847; RCW 71.05.230. Relevant here, one such requirement is that "[t]he person has been advised of the need for voluntary treatment and the professional staff of the facility has evidence that he or she has not in good faith volunteered." RCW 71.05.230(2).

RCW 71.05.240(3) provides that,

> If the person or his or her attorney alleges, *prior to the commencement of the hearing*, that the person has in good faith volunteered for treatment, the petitioner must show, by preponderance of the evidence, that the person has not in good faith volunteered for appropriate treatment. In order to qualify as a good faith volunteer, the person must abide by procedures and a treatment plan as prescribed by a treatment facility and professional staff.

(Emphasis added.) "Where a potential detainee has put her status as a good faith voluntary patient at issue, the burden is on the State to show by a preponderance of the evidence that the patient has not in good faith volunteered for appropriate treatment before involuntary treatment may be ordered." *In re Det. Kirby*, 65 Wn. App. 862, 870-71, 829 P.2d 1139 (1992). To qualify as a good faith voluntary patient, the individual must (1) express a willingness to abide by the procedures and treatment plan prescribed by the facility and professional staff and (2) have a track record which does not belie the individual's stated intent. *In re Det. Chorney*, 64 Wn. App. 469, 479, 825 P.2d 330 (1992).

B.     The State was Not Required to Prove Lack of Good Faith

Here, RCW 71.05.240(3) requires a person or their attorney to allege "*prior to the commencement of the [probable] cause hearing*, that the person has in good faith volunteered for treatment." (Emphasis added). While A.K.'s attorney appeared to put her status as a good faith volunteer at issue *during* the hearing, nothing in the record shows that A.K. or her attorney alleged so *prior* to the commencement of the hearing.

Because A.K. and her attorney failed to put her status as a good faith voluntary patient at issue prior to the probable cause hearing, the State was not required to prove her lack of good faith by a preponderance of the evidence. RCW 71.05.240(2). Accordingly, we decline to address whether substantial evidence supports the court's finding as to this issue.

14

## CONCLUSION

We affirm the trial court's order involuntarily committing A.K. up to 14 days.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Maxa, J.

Cruser, A.C.J.