[No. 15215-7–I.  Division One.  March 9, 1987.]

*In the Matter of* STEPHEN MEISTRELL.

---

*Mark W. Muenster* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Gerald Smith* and *Terence D. Harrington, Deputies,* for respondent.

SCHOLFIELD, C.J.—Stephen Meistrell appeals the trial court's granting of the State's petition to commit him for involuntary treatment for a period of 14 days.

## FACTS

Meistrell was initially detained for 72 hours pursuant to a custody authorization issued July 21, 1984, following his wife's contact with crisis outreach personnel. On July 24, 1984, a petition for 14–day involuntary treatment was filed, alleging that Meistrell represented ·a likelihood of serious harm to others. A hearing on the petition was held on July 25, 1984.

Meistrell's wife, Roberta, testified to both past and recent events concerning her husband's mental illness. Roberta testified that her husband was hospitalized approximately 15 months previously for approximately 2 weeks, with some follow–up therapy and medication. She also testified that prior to that hospitalization, Meistrell had bitten her on the face. Additionally, prior to the previous hospitalization, Meistrell had placed his children, then approximately 1 year and 4 years old, in the basement crawl space under the house and nailed the door to the basement shut.

Roberta further testified that approximately 2 months prior to the July 25 hearing, Meistrell left for California to stay with his sister and to look for work. He then telephoned his wife and told her that his sister had refused to feed him and that he was hungry. Roberta also described Meistrell's behavior when he returned from California the week previous to the hearing as "real hyper", and she stated that he had trouble sleeping and spoke a lot about peace and love.

Roberta testified that during one visit with the children shortly after his return, Meistrell began to chide his 5–year–old daughter for having dropped her younger brother (age 2) while holding him, causing him to lose a front tooth. Meistrell apparently held the child upside down while quoting from the Bible, telling her that she was not nice because of what she had done. Roberta testified that the conversation frightened her daughter.

Shortly after this incident, Meistrell was outside with his son and daughter playing on a homemade teeter–totter. He

told his daughter to stand on one side of the teeter–totter while he stood on the other, and then he abruptly jumped off, causing the child to fall. Meistrell repeated these instructions to his daughter, jumped off, and she fell again. Then Meistrell ordered both of the children onto one side, got on the other side, jumped off, and both children fell.

Roberta also testified that during one visit, Meistrell spanked his 2–year–old son for not behaving properly at the dinner table and put the child in his room. Roberta testified that her son was very upset because he was not normally treated that way.

Additionally, Roberta testified that Meistrell told her that he believed her ex–husband had hired people to follow Meistrell and beat him up. Meistrell also told Roberta that if she attempted to leave their marriage, he would seek out and kill her ex–husband. Roberta testified she was frightened by her husband's behavior.

Dr. Oscar Romero, attending psychiatric physician at Harborview Medical Center and one of the signers of the 14–day petition, testified that Meistrell told him that his wife was afraid of him. Romero indicated that Meistrell had threatened to kill his wife's ex–husband. Romero indicated, however, that he could not describe any recent overt act indicating threats by Meistrell to his wife's ex–husband. Romero testified that Meistrell had been taking prescribed lithium for manic–depressive illness, but Meistrell's lithium levels the previous day were at .46, which is below the considered therapeutic level of .60.

Dr. Thomas Hyde, a psychologist at Harborview, testified that after evaluating Meistrell, he believed that Meistrell suffered from a psychotic mental disorder, with paranoid delusions. Hyde testified he believed that Meistrell was capable of acting upon his delusions in a way which would place other persons in jeopardy.

Beverly Miller, M.S.W., testified that she evaluated Meistrell in his home on July 21, 1984. She described Meistrell as extremely tense, irritable, paranoid and delusional. Miller testified that Meistrell accused her of having

tapped his phone. Miller observed that Meistrell had been burning items in the fireplace on a hot day with no screen. At that time, Meistrell refused to discuss any problems he might have, and stated that he was going to return to California.

Father Matthew Naumes, a Roman Catholic priest, testified that he had provided counseling to Meistrell on the day before he was detained at Harborview. Meistrell called the next day, anxious because he believed that the police would arrive to take him to Harborview based on his wife's complaint. Father Naumes and Meistrell spent several hours together talking prior to the arrival of the personnel from Harborview. Father Naumes described Meistrell as unduly nervous, but stated that he showed no violent or threatening behavior. Father Naumes testified that when the mental health professionals arrived, Meistrell was upset, but not out of control.

James Paris, a family friend of the Meistrells, testified that, although Meistrell was a "high energy" type of person, Paris had never known his behavior to be threatening to others. Florand Kuffel testified that Meistrell stayed with him for 2 days the previous week. He further testified that Meistrell seemed eager to find work and was not threatening in any way.

The court, based on the testimony presented at the hearing, granted the petition for 14–day involuntary treatment, and ordered the commitment, which was carried out shortly thereafter.

## MOOTNESS

■ Although Meistrell's commitment has already been served, both parties argue this case should be decided by this court. In *Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984), the Washington Supreme Court delineated the criteria to be considered in determining whether a case contains sufficient public interest to be decided, although technically moot. These criteria are:

(1) the public or private nature of the question presented; (2) the desirability of an authoritative determination which will provide future guidance to public officers; and (3) the likelihood that the question will recur.

*Dunner,* at 838. Here, both parties argue that this case involves matters of continuing and substantial public interest. The nature of a question involving involuntary commitment is a public one, since it involves government intrusion upon the liberty of an individual. At the time this case was argued, we had no prior cases discussing the burden of proof in 14–day commitment cases. Since then, *In re LaBelle,* 107 Wn.2d 196, 728 P.2d 138 (1986) has been decided. The Supreme Court decided *LaBelle* despite mootness on reasoning we believe to be applicable here. We therefore find that the *Dunner* criteria are met here, and this case should be decided, even though technically moot.

## RECENT OVERT ACT

Meistrell argues that the State did not prove its case by a preponderance of evidence. He argues that the only evidence of a threat made was against his wife's ex–husband, and that the threat was not accompanied by a recent overt act.

RCW 71.05.240 reads in part as follows:

If a petition is filed for fourteen day involuntary treatment, the court shall hold a probable cause hearing within seventy–two hours of the initial detention of such person as determined in RCW 71.05.180, as now or hereafter amended. . . .

At the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that such person, as the result of mental disorder, presents a likelihood of serious harm to others or himself, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed fourteen days in a facility certified to provide treatment by the department of social and health services. If the court

finds that such person, as the result of a mental disorder, presents a likelihood of serious harm to others or himself, or is gravely disabled, but that treatment in a less restrictive setting than detention is in the best interest of such person or others, the court shall order an appropriate less restrictive course of treatment for not to exceed fourteen days.

RCW 71.05.020(3) defines "likelihood of serious harm" as:

(a) A substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others;

Meistrell's hearing focused on subsection (3)(b) because the State was concerned about harm he might inflict upon others.

■ The language of RCW 71.05.020(3)(b) was construed in *In re Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982). There, the Washington Supreme Court noted that the statute requires that the "substantial risk [of] physical harm" be "evidenced by behavior" that has caused harm or creates the reasonable apprehension of harm. The court further noted that courts in other jurisdictions have required a recent overt act to justify a finding of dangerousness. *Harris*, at 284. The *Harris* court adopted that analysis as follows:

We thus interpret RCW 71.05.020 as requiring a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one which has caused harm or creates a reasonable apprehension of dangerousness.

*Harris*, at 284–85.

■ In its written findings and conclusions, the trial

court here did not refer to any specific recent overt act. However, in the absence of a written finding on a particular issue, an appellate court may look to the oral decision to determine the basis for the trial court's resolution of that issue. *In re LaBelle, supra; Goodman v. Darden, Doman & Stafford Assocs.,* 100 Wn.2d 476, 670 P.2d 648 (1983). In the trial court's oral decision, it referred to the teeter–totter incident. The court stated as follows:

> But the perception for Roberta is, and I think, a very real one, that it could indeed be a serious injury and it does not take very much with small children to get a serious injury and one does not have to be very sophisticated.

Thus, we determine that the trial court found a recent overt act, which was supported by substantial evidence. The question remains whether the recent overt act found by the trial court, along with the other conduct testified to by the State's witnesses, constituted a likelihood of serious harm, that is, a substantial risk that physical harm would be inflicted on others.

The determination of whether particular statutory language applies to a factual situation is a conclusion of law and is fully reviewable by the appellate court. *See Blake v. Federal Way Cycle Ctr.,* 40 Wn. App. 302, 698 P.2d 578, *review denied,* 104 Wn.2d 1005 (1985). Because the recent overt act of the teeter–totter incident did involve physical harm to the children, and because the threat to Roberta's ex–husband had as its subject matter serious physical harm, this court can say as a matter of law that the trial court properly found a substantial risk of physical harm as required by RCW 71.05.020(3).

### PRIOR MENTAL HEALTH HISTORY

Meistrell argues that evidence of his prior mental health history was not relevant to the issue before the court.

Although Meistrell argues that only evidence concerning his current condition was relevant at the hearing, courts have considered evidence of previous mental condition to

determine present mental condition. In *Boynton v. Burrows,* 167 F.2d 759 (D.C. Cir. 1948), the United States Court of Appeals commented that

> Where the mental condition of a person is under inquiry as of a particular time, his prior and subsequent condition may be inquired into for the purpose of reflecting upon his mental state at the time in question.

*Boynton,* at 760.

Although no Washington case has addressed the question of whether an individual's prior mental history is relevant in an involuntary commitment proceeding, the Washington Supreme Court, in *State v. Odell,* 38 Wn.2d 4, 20, 227 P.2d 710 (1951), quoted from 1 F. Wharton, *Criminal Evidence* § 318, at 428 (11th ed. 1935) regarding mental irresponsibility for a criminal act as follows:

> Both the state and the defendant may go to great length in offering evidence as to acts, conditions, and conduct of the accused, not only at the time of the offense, but prior and subsequent thereto.

■ Applying this reasoning to the involuntary commitment setting, we determine that recent past mental history is relevant in determining present and immediate future mental behavior. With respect to the case before us, it is important to note that the psychologist who testified at Meistrell's hearing felt that Meistrell's recent past behavior was a reasonable predictor of present and immediate future behavior.

### ER 404

Meistrell also argues that evidence of his prior mental history is inadmissible under ER 404. The State responds that ER 404 has no applicability to an involuntary commitment proceeding, citing *Dunner v. McLaughlin,* 100 Wn.2d 832, 851, 676 P.2d 444 (1984) in support of that argument. *Dunner* is not particularly instructive as it only addressed the question of the applicability of ER 404(b) in a footnote in which the court states:

> ER 404 has no applicability to the circumstances of this involuntary commitment proceeding and need not be addressed.

A close examination of ER 404 shows that its purpose is to exclude character evidence. The reason for exclusion is that the decision whether certain conduct was committed should not be based on evidence of a certain character trait of the performer of the conduct. Prior mental history is not excluded by ER 404 precisely because it is not character evidence, but rather, evidence of behavior. Meistrell's argument concerning ER 404 cannot be sustained.

## LESS RESTRICTIVE ALTERNATIVE

Meistrell argues that the State failed to even investigate the possibility of a less restrictive treatment alternative, and thus did not comply with the statute.

RCW 71.05.240 requires the court to consider less restrictive alternatives to involuntary detention and treatment, and only order detainment for involuntary treatment if it finds that no such alternatives are in the best interests of the patient or others. Dr. Hyde's testimony was that he would not recommend a less restrictive treatment setting at the time of the hearing because he believed Meistrell to be dangerous. Hyde went on to say that because it was the feeling of the hospital staff that a less restrictive treatment setting was not appropriate, the hospital had not pursued the establishment of any such program for Meistrell. As a result of this testimony, the trial court found that treatment in a less restrictive alternative setting was not in the best interest of Meistrell and others.

Where the trial court's finding is supported by substantial evidence, the appellate court will not substitute its judgment for that of the trial court. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959). Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair–minded, rational person of the truth of the declared premise. *In re Snyder*, 85 Wn.2d 182, 532 P.2d 278 (1975). *See also In re LaBelle, supra.* Although the evidence concerning a less restrictive treatment alternative for Meistrell was not extensive, a fair–minded, rational person can rely on the testimony of a

licensed clinical psychologist—whose job it is to evaluate the dangerousness of patients—who states that he believes a less restrictive treatment alternative is inappropriate. The trial court did not err in this finding.

Judgment affirmed.

WILLIAMS and WEBSTER, JJ., concur.