# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of  )    DIVISION ONE
                                    )
M.P.                                )    No. 70421-4-I
                                    )
                                    )    UNPUBLISHED OPINION
                                    )    FILED: September 15, 2014
_____  )

DWYER, J. — M.P. appeals from a 14-day involuntary commitment order,

contending that the trial court erred by concluding that he posed a substantial risk

of harm to others.[1]  However, this conclusion was supported by the facts as

found by the trial judge.  Accordingly, we affirm.

I

M.P. was detained on May 3, 2013.  Shortly thereafter, the State filed a

petition in King County Superior Court, seeking that he be detained for up to 14

days for mental health treatment.  The State's petition was heard on May 8 by

Judge James Cayce.  The court heard testimony from four witnesses.  It deemed

the testimony of the State's three witnesses—Todd Ryburn, Uy Tu, and Dr.

Janice Edwards—credible.

First, the State offered testimony from Todd Ryburn, a case manager at

the Host Program, which provides services to people who are vulnerable,

---

[1] See RCW 71.05.240(3); RCW 71.05.020(25).

homeless, and, usually, experiencing some form of crisis. Ryburn had worked with M.P. since February 2012 and had assisted M.P. with obtaining housing at Aurora House—a supportive housing project. Ryburn stated that, although M.P. was always "intense," until recently he had been polite and pleasant. According to Ryburn, M.P.'s aberrant behavior began when he made two telephone calls to Ryburn. During the first call, M.P. was "intense" but did not seem angry. He was able to express his concern that people were entering his room and that someone was making his room smell so bad that he could not sleep. However, during the second call, M.P. was so irate and uncharacteristically upset that Ryburn terminated the conversation. M.P. was difficult to understand in that call, but he expressed some of the same concerns as in the first call and added that he believed that people were colluding against him.

On May 3, 2013, Ryburn went to Aurora House to visit M.P. The meeting "went very poorly." M.P.'s demeanor, which Ryburn described as "loud and intense and irrational," caused Ryburn concern. Ryburn wanted to meet with M.P. "in the open" because he did not feel safe. Based upon M.P.'s posture and presence, Ryburn felt that M.P. might "lash out" at him. M.P. refused the request and expressed a desire to meet in private. Ryburn eventually agreed to meet with M.P. in a conference room, but he required that the door remain open. Before the meeting began, M.P. became upset with Ryburn's insistence that the door remain open. He became fixated on the identity of Ryburn's boss, and expressed a belief that Ryburn was now among the group of people who were colluding against him. Ryburn stated several times during his testimony that

M.P.'s behavior made him feel unsafe. Ryburn stated that, prior to this event, he had never felt unsafe around M.P. Indeed, Ryburn testified, he had never previously experienced any problems meeting with M.P. in private. In fact, Ryburn had met with M.P. at M.P.'s apartment the previous month and the interaction had been pleasant. However, on May 3, as Ryburn detailed in his testimony, M.P. behaved very differently.

Ryburn terminated the meeting due to M.P.'s behavior and went into the front office of Aurora House, where he stood behind a counter. M.P. followed Ryburn and refused to back away. Ryburn responded by moving into a back room of the office, where he closed the door and the blinds. Although M.P. briefly "disappeared," he returned and began yelling and knocking hard on the closed door. This made Ryburn feel unsafe. With the assistance of Lisa Hilton, the Aurora House housing manager, Ryburn left the room through a back door.

Ryburn remained at Aurora House until the designated mental health professionals and police officers arrived. Prior to their arrival, Ryburn watched video footage of M.P. and another client in an altercation. The video, according to Ryburn, showed M.P. and the other individual posturing and preparing to fight one another. While M.P. was being placed on an ambulance stretcher, he told the police that he was "going to come back and blow away the person in room 322" and then demanded that the police be sure they "heard" him. M.P.'s threat made Ryburn concerned for the safety of the Aurora House residents—particularly the resident in room 322. Ryburn was aware that M.P. had recently been charged with assault, which added to Ryburn's concern for his own safety.

Next, the State offered testimony from Uy Tu, a clinical support specialist at Aurora House. Tu's primary responsibility was to assist with the concerns of Aurora House residents. He explained that when M.P. first moved in, approximately a month prior to his hospitalization, he was a good resident who was polite and had no reported issues. This changed in the two to three weeks prior to his detention. M.P. menaced Tu three times in the three weeks prior to his detention.

Tu testified that M.P. began insisting that people were entering his apartment in order to "make a fool of him" and "mess" with him. M.P. insisted that things in his apartment had been tampered with, even though he lived alone and despite the fact that no one other than staff members had access to his apartment. M.P. also told Tu that his neighbor was responsible for causing a strong odor, which smelled like crack or heroin, to be present in his apartment. Tu testified that M.P. exhibited menacing behavior during this interaction, including leaning toward Tu and staring him down, as if forcing Tu to focus his gaze on M.P. Based upon M.P.'s concerns, Tu went to M.P.'s floor and unit to investigate, but did not smell anything unusual.

Sometime thereafter, Tu and Hilton met with M.P. to address his concerns. Prior to the meeting, and while Tu and Hilton were speaking privately, M.P. stared at Tu through the window in a manner that caused Tu to feel unsafe. Once the meeting began, M.P. demanded to know why Hilton—who he had, in fact, requested attend the meeting—was present. When Tu explained that Hilton was present because he did not feel safe being alone with M.P., M.P. became

even more angry and menacing. The menacing behavior was much the same as before—leaning toward Tu and staring him down. Although M.P. had just requested that his stove be repaired, after he was informed that—due to safety concerns—two staff members, rather than one, would be sent, he refused to permit them to enter his unit. Tu testified that he felt unsafe due to M.P.'s angry and menacing demeanor.

Finally, the State offered testimony from Janice Edwards, Ph.D. Dr. Edwards introduced portions of M.P.'s medical record that documented behavior that was consistent with that which was described by Ryburn and Tu. While speaking with a psychiatrist on the day that he was detained, M.P. displayed no understanding of the reasons for which he was in the hospital. He also exhibited threatening behavior and demanded to be released from his restraints. Throughout his hospitalization, M.P. remained in restraints and continued to be verbally aggressive and confrontational toward staff members and uncooperative with treatment. M.P. exhibited threatening body language and poor space boundaries. Security personnel were required to assist on several occasions. Edwards testified that, although there was no evidence that M.P. had assaulted anyone at Aurora House or the hospital, his consistent pattern of hostility and aggression toward others, due to his paranoia, placed him at risk to physically harm others.

After all of the witnesses had testified, the trial court orally pronounced findings of fact and conclusions of law on the record, and entered summary findings and conclusions on a preprinted form. The trial court found that M.P.

presented a likelihood of serious harm to others and ordered him detained for involuntary treatment for up to 14 days. Subsequently, on June 27, 2013, the court entered detailed supplemental findings and conclusions, which were clearly intended by the trial judge to be comprehensive. They included three substantial findings of fact, which are reproduced below:

> 5. The Court finds that the Respondent has a mental disorder that has a substantial, adverse effect on his cognitive and volitional functions. This is based upon the testimony of the State's witnesses, including Case Manager Todd Ryburn and Housing Support Staff Uy Tu, who described the distinct change in the Respondent's behavior from his usual presentation over the course of several weeks. They testified that when he first moved into the Aurora House, Respondent was doing well and they both had pleasant interactions with him. However, that changed within the 2-3 weeks prior to Respondent's detention and he became paranoid and menacing toward them. The Court also relies on the testimony of Dr. Edwards, who testified that Respondent has a working diagnosis of Psychosis NOS ("Not Otherwise Specified") with a possible Traumatic Brain Injury (organic disorder) as well. She based this opinion on the testimony of Mr. Ryburn and Mr. Tu, as well as her own interactions with the Respondent and the hospital chart. This included the evidence of Respondent's olfactory hallucinations that there were smells of heroin and crack coming from the apartment next door to his, which nobody else was able to smell, as well as his overall paranoia that others were coming in his apartment without permission in order to "mess with him"' and that many people, including Mr. Ryburn and Mr. Tu, were colluding against him. This was also based upon his menacing and threatening behavior to Mr. Ryburn, Mr. Tu, and the hospital staff. As far as the witnesses were aware, the Respondent was not on any medications. During Respondent's own testimony, he addressed many of these same topics as well, testifying as to his belief that the residents next door were doing drugs and causing a horrible smell, that nobody at the Aurora house was helping him, and that people were in his apartment and causing problems.
>
> 6. The Court finds that as a result of Respondent's mental disorder, Respondent presents a substantial risk of harm to others, as defined under RCW 71.05.020(25)(a)(ii). This is based upon the testimony of the State's witnesses, including the testimony of Mr.

Ryburn and Mr. Tu who both testified that while they were not actually assaulted, they both felt intimidated and menaced by the Respondent. Mr. Ryburn further testified that he was aware the Respondent had a pending assault charge in District court, that he viewed a video tape of the Respondent in an altercation with another Aurora House resident over a telephone, and that he heard Respondent tell the police officers who were present on the day of his detention that "I'm gonna come back and blow away the person in room 322" followed by "You hear me?" Both statements were delivered in an "intense" manner. Mr. Ryburn testified to the menacing behavior he experienced while at the Aurora House attempting to assist the Respondent on the day of his detention, to the point where he did not want to be in a closed private room with the Respondent and ultimately removed himself from the situation. Mr. Tu testified that the Respondent had menaced him 3 times in the few weeks leading up to his detention, and despite attempts to deescalate the situations, the Respondent continued his behaviors. Dr. Edwards further testified to similar menacing behaviors toward the hospital staff during Respondent's stay at Northwest Hospital. She testified that while she herself was not afraid of him, he had been in 4 point restraints for much of his stay at the hospital. The Respondent denied that he was menacing toward any of the aforementioned people during his own testimony.

. . . .

8. The Court finds that treatment in a less restrictive setting is not in the best interest of Respondent and others. This is evidenced by the testimony of Dr. Edwards. She testified that a less restrictive order was not appropriate for several reasons. First, the Respondent does not have an outpatient prescriber. Second, his denial of any problems and his lack of knowledge as to why he was in the hospital does not demonstrate appropriate insight for a less restrictive order. Third, as long as he is still actively thinking that others are out to harm him, he is at risk to continue to menace and assault somebody were he to be out in the community. Finally, if the Respondent were to be released without being sufficiently stabilized, he would lose his housing placement at the Aurora House.

These findings of fact are largely unchallenged on appeal.[2]

---

[2] M.P. challenges finding of fact 2.1 from the findings of fact entered on May 8, which states, "The Respondent, as a result of a mental disorder, presents a likelihood of serious harm to

II

M.P. contends that the trial court erred by ordering additional inpatient treatment. This is so, he asserts, because the State failed to prove that M.P. posed a substantial risk of harm to others, as evidenced by a recent overt act that placed another person in reasonable fear.[3] We disagree.

The court entered findings of fact and conclusions of law based on the evidence presented at the May 8 trial. Generally, where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

M.P. was temporarily detained as a threat to others; the State filed a petition for 14 days of involuntary treatment. The applicable statutory framework for involuntary treatment cases is found in RCW 71.05.240(3) and RCW 71.05.020(25).

RCW 71.05.240(3) states:

---

others." He also challenges the portion of supplemental finding of fact 6 that states, "[A]s a result of Respondent's mental disorder, Respondent presents a substantial risk of harm to others, as defined under RCW 71.05.020(25)(a)(ii)."

[3] While M.P. cites liberally to our due process jurisprudence, a well-reasoned due process argument is not similarly forthcoming. To the extent that M.P. does, in fact, argue that his due process rights were violated, we reject his argument. Involuntary commitment for treatment of mental disorders is a significant deprivation of liberty protected by due process of law. In re Det. of LaBelle, 107 Wn.2d 196, 201, 728 P.2d 138 (1986); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. However, our Supreme Court has previously held that chapter 71.05 RCW provides a valid constitutional basis for the involuntary commitment of an individual so long as "a showing of a substantial risk of physical harm as evidenced by a recent overt act" is accomplished. In re Harris, 98 Wn.2d 276, 284, 654 P.2d 109 (1982) (emphasis added).

At the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that such person, as the result of mental disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed fourteen days in a facility certified to provide treatment by the department. If the court finds that such person, as a result of a mental disorder, presents a *likelihood of serious harm*, or is gravely disabled, but that treatment in a less restrictive setting than detention is in the best interest of such person or others, the court shall order an appropriate less restrictive course of treatment for not to exceed ninety days.

(Emphasis added.)

As defined by the relevant portion of the statute:

"Likelihood of serious harm" means:
(a) A substantial risk that: . . . (ii) physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; . . . or
(b) The person has threatened the physical safety of another and has a history of one or more violent acts.

RCW 71.05.020(25).

As a preliminary matter, M.P. contends that the threat he made against the person in room 322 may be material as to subsection (b) of RCW 71.05.020(25) but not as to subsection (a)(ii). He argues that to conclude otherwise would render the "threatened the physical safety of another" language of subsection (b) superfluous and redundant to subsection (a)(ii). We disagree.

There are distinct and different requirements for commitment pursuant to subsection (a)(ii) and subsection (b). Commitment under (a)(ii) requires proof of *behavior* that *harms or causes reasonable fear of harm.* Commitment under (b)

requires proof of a *threat of harm* and a *history of violence*. Thus, subsection (a)(ii) requires proof of behavior and reasonable resulting fear. Subsection (b), on the other hand, requires proof of a threat and a violent history. Treating evidence of a threat as evidence of behavior under (a)(ii) does not, because of the differences in the other requirements of the subsections, subsume subsection (b) within its ambit.[4]

Evidence of threats may be relevant to both the "behavior" and "reasonableness" requirements of subsection (a)(ii). Proof of threats, as in this case, may tend to establish a pattern of behavior. Indeed, M.P.'s death threat against another Aurora House resident was part of a pattern of increasingly alarming behavior. The threat clarifies and furthers the pattern. Moreover, evidence of the threat is relevant in demonstrating the reasonableness of Ryburn's and Tu's fear. The fact that M.P. threatened to kill another resident lends credence to Ryburn's and Tu's belief that M.P. presented a threat to their physical safety. Moreover, Ryburn's ability to distinguish a threat to himself from a threat against others bolsters his testimony by displaying a nuanced reaction to each of M.P.'s threatening behaviors. It was not simply a general fear of M.P.'s behavior that made Ryburn fear for his safety.

---

[4] In fact, in the somewhat analogous context of involuntary commitment of sexually violent predators (SVP), the legislature has specifically endorsed consideration of threats as a means of demonstrating a substantial risk of harm. In SVP cases, as in involuntary treatment cases, the State must demonstrate a substantial risk of harm evidenced by a recent overt act. See In re Det. of Albrecht, 147 Wn.2d 1, 8, 51 P.3d 73 (2002). Indeed, the "overt act" requirement was first introduced by our Supreme Court in the involuntary treatment context. Albrecht, 147 Wn.2d at 8 n.9. After the court added a similar requirement in the SVP context, the legislature amended the SVP act to codify the requirement. Albrecht, 147 Wn.2d at 8. "Recent overt act" in that context now explicitly includes: "any act, threat, or combination thereof." RCW 71.09.020(12).

M.P.'s main contention is that the court erred in concluding that M.P. presented a substantial risk of harm to others. Again, we disagree.

A substantial risk of harm must be evidenced by an "overt act" that has "caused harm *or creates a reasonable apprehension of dangerousness*."[5] In re Harris, 98 Wn.2d. 276, 284-85, 654 P.2d 109 (1982) (emphasis added). "[R]ecent past mental health history is relevant in determining present and immediate future . . . behavior." In re Meistrell, 47 Wn. App. 100, 108, 733 P.2d 1004 (1987).

M.P. challenges discrete portions of two findings of fact.[6] He also contends that those findings of fact, or parts thereof, should properly be characterized as conclusions of law. Even if that is the case, see Meistrell, 47 Wn. App. at 107, it does not change our analysis or the outcome of this case. The remainder of the trial court's factual findings are unchallenged and are, thus, verities on appeal. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

The trial court entered findings of fact that describe a number of overt acts by M.P. that placed both Ryburn and Tu in fear of being harmed by M.P. For example, Ryburn testified to M.P.'s menacing behavior at Aurora House on the day M.P. was detained, which had caused Ryburn to end his meeting with M.P. out of concern for his own safety. Tu testified that M.P. had menaced him three

---

[5] Throughout the trial court proceedings and in his merits brief, M.P. relies heavily on the fact that he never physically assaulted Ryburn or Tu. While the record does not gainsay M.P.'s position, proof of a battery is not necessary to establish that M.P. posed a substantial risk of physical harm to others.

[6] See n.2 infra.

times in the few weeks leading up to his detention and that, despite Tu's attempts at de-escalation, M.P. persisted in his menacing behavior. The court credited this evidence and incorporated both Ryburn's and Tu's testimony in its findings of fact.

Similarly, the court's findings of fact support the conclusion that both Ryburn's and Tu's fears were reasonable. In this case, the recent actions of M.P., compared to his relatively stable presentation just a few weeks earlier, are highly relevant. M.P. unexpectedly engaged in threatening behavior toward both Ryburn and Tu. He displayed angry, menacing, and paranoid behavior toward the people who were trying to offer assistance and was increasingly disturbed by things that others could not understand. In the span of just a few weeks, he caused those who knew him well to feel unsafe. Moreover, M.P. engaged in an altercation with another resident, threatened to "blow away" a different resident, and had recently been charged in district court for a separate alleged assault. Edwards testified that in her expert opinion, M.P.'s consistent pattern of hostility and aggression toward others, due to his paranoia, placed him at risk to harm others. The trial court credited her testimony. These facts, and the reasonable inferences that can be drawn therefrom, support the trial court's conclusion that M.P. committed a recent overt act that created a reasonable apprehension of dangerousness. There was no trial court error.

No. 70421-4-I/13

Affirmed.

We concur:

_Dwyer, J._

_Trickey, J_

_Appelwick, J_