# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Detention of:<br><br>T.C.<br><br>                         Petitioner. | No.  46325-3-II<br><br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — T.C. appeals an order committing her to inpatient mental health treatment for a period of up to 14 days.  She argues that (1) the trial court did not have jurisdiction over her case; (2) the trial court erred in admitting hearsay; (3) she received ineffective assistance of counsel; (4) the trial court violated her right to be present at a second hearing; (5) there was insufficient evidence for the trial court to conclude she presented a likelihood of serious harm to others; (6) the State committed prosecutorial misconduct; (7) she was subject to an illegal search and seizure; and (8) other arguments for which no record exists before us.[1]  We affirm.

---

[1] T.C. makes over thirty assignments of error; however, she did not adequately brief many of the issues, RAP 10.3 (a)(4) & (6), and we do not review them.  RAP 12.1(a).  We also do not review T.C.'s claims that involve matters outside of the appellate record, including her allegations of an illegal search and seizure, prosecutorial misconduct, a right to medical treatment, and illegal detainment.  *See State v. Wade*, 138 Wn.2d 460, 465-66, 979 P.2d 850 (1999).

FACTS

I.      EVENTS LEADING TO INVOLUNTARY COMMITMENT HEARING

T.C., a homeless veteran, amassed parking violations for sleeping overnight in her car in a U.S. Department of Veterans Affairs Administration (VA) parking lot.  United States (U.S.) Deputy Marshal Edgar Garcia received an e-mail from a federal district court clerk who, concerned about T.C.'s aggressiveness, asked him to send an extra deputy to a court hearing for the violations, scheduled for May 7, 2014.  Garcia attended the hearing and witnessed T.C. testify about a conspiracy against her.  T.C. seemed unfocused.  Garcia described her behavior as aggressive and rude.  He had never previously witnessed this behavior in federal court.  During a recess, Garcia told T.C. that she needed to calm down because if the judge held her in contempt, Garcia would have to take her to jail.

When the proceedings reconvened, T.C. accused the judge of being in a deal with the Assistant United States Attorney (AUSA).  After the hearing, Garcia and his partner, U.S. Senior Inspector Arnold Knight, listened to voicemails T.C. left for the judge and the AUSA.  She shouted and seemed very angry.  The voicemails were heated and disjointed.  Garcia approached T.C. and instructed her not to make any more phone calls to the judge or the AUSA.  She responded in a hostile manner.  T.C. alleged that a continuing conspiracy existed against her, and that the judge and the AUSA should do what she said or there would be consequences.

On May 16, the VA police called Garcia to let him know T.C. was again sleeping in her car in the VA parking lot.  Garcia and Knight contacted T.C.  For over two hours, they tried to get T.C. to exit her car.  She did not cooperate.  T.C. told the officers she had a permit to carry a firearm.  T.C. admitted to Garcia and Knight that she sent e-mails and voicemails to the judge and the AUSA, but they were not threats because she did not say anything about violence.  After two

hours, Knight finally gave T.C. an ultimatum to exit the vehicle or he would break the window to remove her. After T.C. exited her car, Knight took her to the mental health unit at St. Clare Hospital.

II.    INVOLUNTARY COMMITMENT HEARING

On May 20, T.C.'s involuntary commitment hearing occurred. Jessica Shook, the designated mental health professional (DMHP) who evaluated T.C. at St. Clare Hospital and filed the petition for her commitment, testified. She said that after her evaluation of T.C., she and Dr. Vutla, the medical doctor who co-petitioned the court for T.C.'s commitment, diagnosed T.C. with "acute stress disorder with a rule out of post-traumatic stress disorder." Report of Proceedings (RP) at 5. Shook believed T.C. presented a likelihood of serious harm to others based on the information she received from the U.S. Marshal's office regarding T.C.'s threats toward a federal judge and an AUSA. When making her evaluation, Shook read and considered the threats T.C. e-mailed to the judge and the AUSA. Shook did not believe that a less restrictive alternative was appropriate, and recommended T.C. be held up to 14 days in an evaluation and treatment facility. Garcia and Knight testified consistently with the above facts. In addition, Knight said he had concerns about T.C. being a danger.

During Garcia's testimony, T.C.'s counsel objected to his reading the e-mail T.C. sent to the judge. The trial court permitted Garcia to read the e-mail into evidence. It stated:

> All lines been crossed. I will not sit around and do nothing while my mother's safety's at jeopardy. I do not want to do I—but I will if that is what it takes to get my family's safety and make you understand how serious this is. . . .
> I will start passing out your addresses, phone numbers, and family member names out unless you assure me and prove that you are doing everything to investigate and assure my mother's and family's safety. . . .
> I will be forced to start passing out your information if you do not investigate and protect my family. If you continue to ignore this serious matter then I will place you and your family in the same situation as me and my family.

RP at 9-10.

Lynn Robinson, T.C's friend, testified she had no concerns about T.C.'s behavior, but understood why the U.S. Marshals did. Edward Leggin, another friend of T.C.'s, also testified. He attended the May 7 hearing and witnessed the interaction between T.C. and Garcia. He said that Garcia accurately described what occurred. Leggin did not have any reason to think T.C. was delusional or that she would hurt anyone.

T.C. testified that she currently participated in outpatient treatment because of her brain injury. She did not feel she needed inpatient treatment. T.C. said that in 2010, during a domestic violence incident, she suffered a traumatic brain injury and has been treated by the same team at Harborview Hospital since that injury. She said the injury occurred when she tried to escape her ex-boyfriend, a police officer, after a year and a half of suffering. T.C. said he threatened to shoot her in the head, and he pushed her out a second story window. She admitted that she was also diagnosed with Post Traumatic Stress Disorder (PTSD) from the assault.[2]

T.C. testified about the 2010 incident and her investigation into corruption that she claimed denied her of her civil rights. She also described a conspiracy against her at the VA that caused her to be homeless. T.C. testified that she did not believe she was out of control at the May 7 hearing; she was frustrated.

T.C. said that on the night of May 16, she was asleep. She woke up when a VA officer knocked on her window to explain that U.S. Marshals were there. She claimed the marshals were unprofessional, and that Garcia told her she made threats. T.C. responded that she did not make

---

[2] This court previously affirmed Dennis McCarthy's convictions for assault in the first degree and assault in the second degree which were perpetrated on T.C. *State v. McCarthy*, 178 Wn. App. 90, 312 P.3d 1027 (2013).

threats because to her a threat is physical harm. T.C. admitted that during the interaction with the U.S. Marshals, she called 911 claiming four officers were with her, she was scared, and that they were threatening violence and to break down her car door. T.C. testified that when she arrived at St. Clare Hospital, she spoke with DMHP Thomas Phillips. He asked her if she would seek outside help, and she said she would, but he wrote in her chart that she refused.

The trial court orally ruled that T.C. suffered from a mental disorder and that she was a danger to others or herself. The trial court ordered T.C. to be detained for up to 14 days. The trial court entered written findings of fact and conclusions of law. T.C. appeals.

ANALYSIS

I. ALLEGED ERRORS BY THE TRIAL COURT

A. Personal and Subject Matter Jurisdiction

T.C. argues that the trial court did not have either personal or subject matter jurisdiction to hear her case. She argues that because she dealt with U.S. Marshals and was on federal property when the alleged threats occurred, Pierce County did not have the authority to hear the case, to rule on the case. We disagree.

Under the due process clause, a Washington court may not assert personal jurisdiction over a defendant unless she has the required minimum contacts with the state, and she is given notice and opportunity to be heard. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *see also* Superior Court Mental Proceedings Rule (MPR) 5.1. A resident of a state has the required minimum contacts with the state to allow the state to assert personal jurisdiction over that resident. *Int'l Shoe Co.*, 326 U.S. at 316. Although T.C. is homeless, she is still a resident of Washington. However, a challenge to personal jurisdiction may be waived if it is not timely. CR 12(h)(1). Under the rules of civil procedure, a challenge to personal jurisdiction

is waived if it is not asserted by motion before filing an answer or asserted in the answer itself. CR 12(h)(1). T.C. did not previously contest the trial court's personal jurisdiction, and has waived the challenge.

A trial court's lack of subject matter jurisdiction may be raised at any time and is never deemed waived. CR 12(h)(3). "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." CR 12(h)(3). Superior courts in Washington are courts of general jurisdiction and have almost unlimited subject matter jurisdiction in civil cases; any civil case may be filed in superior court. RCW 2.08.010. Even more specifically, superior courts have jurisdiction to hear and determine involuntary commitment proceedings. RCW 2.08.010; RCW 71.05.240. T.C.'s challenge to the trial court's personal jurisdiction is untimely and is waived. Because the trial court had subject matter jurisdiction, T.C.'s argument fails.

B.    Sufficiency of the Evidence

T.C.'s many assignments of error seem to argue that insufficient evidence existed for the trial court to make its findings of fact. T.C. contends that the trial court ignored the law and procedures to commit an individual. She argues that the trial court erred by basing its reasoning for its conclusions of law on her alleged behavior in a federal court proceeding two weeks prior because the federal judge did not threaten contempt charges. She further argues that the trial court erred by not having a professional psychiatrist evaluate her. We disagree.

1.    Standard of Review

Generally, where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. *Ridgeview Prop. v. Starbuck*, 96

Wn.2d 716, 719, 638 P.2d 1231 (1982). Substantial evidence exists if there is enough to persuade

a fair-minded person of the fact. *Ridgeview Prop.*, 96 Wn.2d at 719. Any unchallenged findings

of fact are considered to be verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59

P.3d 611 (2002).

> 2.     Sufficient Evidence Existed To Support the Trial Court's Findings
>         of Fact and Conclusions of Law

The State may not subject a person to involuntary commitment for the treatment of a mental

disorder without the due process of law. *In re Det. of LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138

(1986).

> If a petition is filed for fourteen day involuntary treatment, . . . the court shall hold
> a probable cause hearing within seventy-two hours of the initial detention of such
> person as determined in RCW 71.05.180.

RCW 71.05.240(1). At the conclusion of the hearing,

> [i]f the court finds by a preponderance of the evidence that such person, as the result
> of mental disorder, presents a likelihood of serious harm, or is gravely disabled,
> and, after considering less restrictive alternatives to involuntary detention and
> treatment, finds that no such alternatives are in the best interests of such person or
> others, the court shall order that such person be detained for involuntary treatment
> not to exceed fourteen days in a facility certified to provide treatment by the
> department.

RCW 71.05.240(3)(a); *see also In re Det. of Meistrell*, 47 Wn. App. 100, 105, 733 P.2d 1004

(1987). Former RCW 71.05.020(25) (2014) defines "[l]ikelihood of serious harm" as:

> (a) A substantial risk that: (i) Physical harm will be inflicted by a person upon his
> or her own person, as evidenced by threats or attempts to commit suicide or inflict
> physical harm on oneself; (ii) physical harm will be inflicted by a person upon
> another, as evidenced by behavior which has caused such harm or which places
> another person or persons in reasonable fear of sustaining such harm; or (iii)
> physical harm will be inflicted by a person upon the property of others, as evidenced
> by behavior which has caused substantial loss or damage to the property of others.

Because T.C. does not specifically challenge the trial court's findings of fact, they are verities on appeal; but, insofar as she challenges the trial court's findings, sufficient evidence exists to support them. Garcia testified about T.C.'s e-mail and voicemail threats. He testified that he approached her on May 7, 2014, and advised her to stop making threats. He said that she was rude and unruly at the hearing on the parking violations. On May 16, Garcia and Knight tried to talk to T.C. through her car window but she was uncooperative.

Substantial evidence showed that T.C. threatened a judge and an AUSA by e-mail and voicemail. The voicemails displayed her anger and disjointed thinking. T.C. said she owned a firearm, and when confronted by federal law enforcement officers while illegally parking on VA property, she was uncooperative. T.C. previously suffered a brain injury as a victim of domestic violence and years later was still receiving treatment. She suffers from PTSD. She believes there was a conspiracy against her. A mental health professional opined that T.C. presented a likelihood of serious harm to others.

Based on the record, substantial evidence existed to support the trial court's findings of fact. In turn, these facts supported the trial court's conclusions of law that, by a preponderance of the evidence, T.C. posed a substantial risk of harm to others.

C.      Evidentiary Errors

T.C. contends that the trial court erred by admitting false evidence and testimony, by not allowing her to present evidence or face her accusers, and by admitting hearsay. She also argues that the trial court erred by not admitting tapes and recordings that she had at the hearing. T.C. did not cite to the record to support her claims. Under RAP 10.3(a)(4) and (6), an appellant's brief must include "assignments of error, arguments supporting the issues presented for review, and citations to legal authority" and references to relevant parts of the record. *Bercier v. Kiga*, 127

8

Wn. App. 809, 824, 103 P.3d 232 (2004). If an appellant's brief does not include argument or authority to support its assignment of error, the assignment of error is waived. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986). We "need not consider arguments that are not developed in the briefs and for which a party has not cited authority." *Bercier*, 127 Wn. App. at 824. Because T.C. did not cite to specific portions of the record or to applicable legal authority to support her arguments, we do not consider her alleged evidentiary errors.

> D. Due Process Violations

T.C. contends that the trial court violated her right to be present because it held a hearing outside her presence and without proper notice to her. In addition, she assigns error for the trial court allowing counsel and the prosecution to testify on her behalf without first inquiring whether she waived her right to be present. T.C. has not presented us with any record of such a hearing, nor does she cite to legal authority to support her arguments. RAP 10.3(a)(6). Therefore, we do not consider these arguments.

II. ALLEGED ERRORS OF APPELLATE JUDGES AND PROCESSES

In her brief, T.C. argues errors by the appellate judges and the appellate procedure. An appellant's brief is not the method in which these complaints should be argued. *See* RAP 1.1; Titles 2, 9, 10 RAP. Therefore, we do not consider these arguments.

III. INEFFECTIVE ASSISTANCE OF COUNSEL

T.C. argues that she received ineffective assistance of counsel at the involuntary commitment hearing. T.C. lists 16 different actions her counsel failed to take that she claims constituted ineffective assistance of counsel. T.C. again fails to cite to the record to support her

claims. Many of T.C.'s arguments relate to matters outside the record. Because of T.C.'s lack of

specificity, we do not review these claims.[3]

We affirm the trial court.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Worswick, P.J.

_____
Lee, J.

---

[3] We have reviewed the record on appeal. We do not see anything in the record before us to indicate that T.C.'s lawyer was ineffective.